UNITED STATES OF AMERICA
<u>WESTERN DISTRICT OF NEW YORK</u>

| | |
|---|---|
| **UNITED STATES OF AMERICA** | <u>Sentencing Statement</u> |
| v. | 21-CR-6096 (FPG) |
| **DARYLL CLARK** | |

     JEFFREY L. CICCONE, Assistant Federal Public Defender for the Western District of New York affirms as follows:

     I am licensed to practice law in the State of New York and the United States District Court for the Western District of New York, and I represent the defendant, Daryll Clark.

     The factual representations made in this Statement are based on investigations by members of my office, conversations with Daryll Clark, his family members and others, a review of the Presentence Investigation Report (hereinafter PSR) dated October 5, 2021, and the following exhibits:

| | |
|---|---|
| Exhibit A: | Temporary Order of Protection dated March 19, 1997; |
| Exhibit B: | East Irondequoit Central School District Student Registration Form, dated April 12, 2002; |
| Exhibit C: | Deborah M. Clark Obituary; |
| Exhibit D: | Highland Family Medicine, Physical Exam Visit Notes, dated August 26, 2019; |
| Exhibit E: | Letter of Acceptance written by Daryll Clark; |
| Exhibit F: | Letter to the Court from Kelsey L. Duell, BSW, Transitional Jail Coordinator, dated January 13, 2021; |
| Exhibit G: | Letter to the Court written by Savanah Clark; |
| Exhibit H: | Letter to the Court written by Carol Adams; and |

1

Exhibit I:    Obituaries of John and Marsha Clark.

## BACKGROUND

On August 17, 2021, Daryll Clark pled guilty to a single-count information charging the receipt of child pornography, in violation of 18 U.S.C. § 2252A(a)(2)(A) and 2252A(b)(1). With a criminal history category of III and an offense level of 39, Mr. Clark's advisory Sentencing Guidelines range is 324 to 405 months. Mr. Clark's plea was entered pursuant to a written rule 11(c)(1)(C) plea agreement. Within the plea agreement, both parties recommended that the Court impose a sentence between 324 and 405 months imprisonment.

The Guidelines range calculation within the PSR differs from that anticipated by the parties in the plea agreement. The PSR calculates Mr. Clark's criminal history category to be a level IV, which results in a recommended sentencing range of 360 to 480 months.

The sentencing hearing is currently scheduled for January 25, 2022.

The defense does not have any objections to the PSR. Although the PSR provides the Court with some information regarding Mr. Clark's background, this sentencing statement highlights additional information regarding his history and characteristics, which may be relevant to the Court's sentencing decision.

## GENERAL SENTENCING AUTHORITY

Under 18 U.S.C. § 3553(a), federal sentencing courts must impose a sentence that is *sufficient, but not greater than necessary*, to meet the purposes of sentencing. This includes the nature and circumstances of the offense and the history and characteristics of the defendant, the need to avoid sentencing disparities between defendants with comparable criminal records who

have been convicted of similar crimes, and the Guidelines themselves. *See United States v. Dorvee*, 616 F.3d 174, 182-83 (2d Cir. 2010) (quoting 18 U.S.C. 3553(a)(1)-(6)).

The sufficient, but not greater than necessary language of § 3553 is commonly referred to as the parsimony clause. *United States v. Williams*, 475 F.3d 468, 476 (2d Cir. 2007). When imposing sentence, the district court must consider the factors mentioned in § 3553(a), including the requirements of the parsimony clause. *Id.* Simply stated, if the district court concludes that either of two sentences would properly serve the statutory purposes of § 3553(a), application of the parsimony clause compels imposition of the lesser sentence. *See United States v. Ministro-Tapia*, 470 F.3d 137, 142 (2d Cir. 2006).

The sentencing court must also consider the advisory Sentencing Guidelines. *United States v. Booker*, 543 U.S. 220, 245-246 (2005). However, [e]ven where a district court has properly calculated the Guidelines, it may not presume that a Guidelines sentence is reasonable for any particular defendant, and accordingly, must conduct its own independent review of the 3553(a) sentencing factors. *United States v. Dorvee*, 616 F.3d at 182 (citing *United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008)).

The importance of individualized sentencing is a central theme in federal criminal law. It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, and sometimes magnify, the crime and the punishment to ensue. *Koon v. United States*, 518 U.S. 81, 113 (1996).

In *Booker*, the United States Supreme Court emphasized the importance of reserving sentencing discretion to federal district court judges. The Court held that:

> The federal sentencing statute . . . requires a sentencing court to consider Guidelines ranges . . . ., but it permits the court to tailor the sentence in light of other statutory concerns as well.

543 U.S. at 245-246.

The Court thereafter reaffirmed its position in *Kimbrough v. United States*, 552 U.S. 85 (2007) stating that:

> The sentencing judge . . . has greater familiarity with ... the individual case and the individual defendant before him than the Commission or the appeals court. . . .  He is therefore in a superior position to find facts and judge their import under ☐ [3553(a)] in each particular case.

*Id.* at 108 (internal quotations omitted).

## U.S.S.G. § 2G2.2 IS FUNDAMENTALLY DIFFERENT FROM MOST OTHER GUIDELINES AND MUST BE APPLIED WITH GREAT CARE

It is now generally accepted that the Sentencing Guidelines in child pornography cases (§ 2G2.2) frequently results in sentences that are significantly higher than necessary. These challenges were most notably addressed in *United States v. Dorvee*, 616 F.3d 174 (2d Cir. 2010).  In that case, the Second Circuit acknowledged that the § 2G2.2 Guideline is fundamentally different from most and that, unless applied with great care, can lead to unreasonable sentences that are inconsistent with what § 3553 requires.  *Id.* at 184.

The Department of Justice's Office of Policy and Legislation has also recognized the problems inherent in the application of the child pornography Guidelines.  In a letter to the Sentencing Commission, the Department of Justice asked the Commission to review "and consider amendments to those guidelines that have lost the backing of a large part of the judiciary.  These reviews should begin with the guidelines for child pornography possession

4

offenses…" *See* Letter to the Honorable William K. Sessions, III, United States Sentencing Commission, by Jonathan J. Wroblewski, Director, Office of Policy and Legislation, Department of Justice, Criminal Division, dated June 28, 2010.

In 1997, the average defendant convicted of possessing, receiving, or distributing child pornography received a mean sentence of 20.59 months. *See* Troy Stabenow, Deconstructing the Myth of Careful Study: A Primer of the Flawed Progression of the Child Pornography Guidelines, http://www.fd.org/pdf_lib/child%20porn%20july%20revision.pdf (2009). Only ten years later, in 2007, defendants sentenced for the same conduct received a mean sentence of 91.30 months – an increase of 443%. This dramatic increase was not based upon empirical research demonstrating a need for incrementally harsher sentences. Rather, it was the result of numerous Congressional mandates that were clandestinely attached to larger legislation, often passing without notice, debate, or scrutiny of any kind. The result for most defendants is a Guidelines range that is a stark violation of § 3553 because it recommends a sentence far greater than necessary to satisfy the purposes of sentencing.

Today's child pornography Guidelines include numerous possible enhancements that were presumably intended to increase the sentences for the most egregious offenders. In reality, however, these Guidelines do little to differentiate the degree of culpability among offenders because essentially all of the enhancements apply in most every case. *See United States v. Jenkins*, 854 F.3d 181, 188-89 (2d Cir. 2017). In *Dorvee*, the Second Circuit rejected a Guidelines range for a first-time offender on the grounds that the child pornography Guidelines were "fundamentally incompatible with § 3553(a)." 616 F.3d at 187. The Court specifically noted that the Guidelines' sentencing enhancements result in a recommended sentence "near or exceeding the statutory maximum, even in run-of-the-mill cases." *Id.* at 186.

5

The Second Circuit reminded district court judges that they "may vary from the Guidelines range based solely on a policy disagreement with the Guidelines."  616 F.3d at 188 (quoting *United States v. Cavera*, 550 F.3d 180, 191).  Moreover, "judges are encouraged to take seriously the broad discretion they possess in fashioning sentences under § 2G2.2 – ones that can range from non-custodial sentences to the statutory maximum – bearing in mind that they are dealing with an eccentric Guideline of highly unusual provenance, which, unless carefully applied, can easily generate unreasonable results."  616 F.3d at 188.

The warnings from the Circuit court opinions, the sentencing judges, the Department of Justice, and commentators, are consistent.  The application of the § 2G2.2 Guidelines result in significantly high sentences for all offenders.  Unless the Guidelines are applied with great care, they can lead to unreasonable sentences that are inconsistent with the requirements of § 3553.

**THE NATURE OF THE OFFENSE AND THE HISTORY
AND CHARACTERISTICS OF THE DEFENDANT**

*Daryll Clark's Childhood*

Daryll Clark, who will turn 34 years old on February 19, 2022, has had an extremely tumultuous life.  Daryll's mother and father, Deborah and Lee Clark, had an explosive relationship.  Daryll recalls it was an everyday occurrence for his parents to yell and scream at each other, often throwing whatever was within reach.  They physically and emotionally abused each other, regularly in the presence of their children.  In March 1997, Deborah Clark petitioned the Monroe County Family Court Clark for an order of protection against Lee Clark. The Court ordered Lee Clark to stay away from Deborah and his children, Daryll, Savanah and Nathaniel.  The Court also awarded temporary custody of the children to Deborah Clark.  *See*

6

Exhibit A, Temporary Order of Protection dated March 19, 1997.  Lee and Deborah finally divorced in 1997, when Daryll was nine years old.

Daryll and his brother and sister lived with their mother after their parents divorced.  Unfortunately, Daryll's mother, Deborah, was addicted to crack cocaine and alcohol.  Daryll says he never knew his mother not to have a beer in her hand.  Daryll painfully recalls that due to his mother's addiction to drugs and alcohol, "she wasn't there like she needed to be."  Although she never left her children alone to go out partying, men regularly came and went from the home.  Daryll remembers that many of these men were physically abusive to his mother, and on one occasion, one of Deborah's boyfriends sexually abused Daryll's sister.  In fact, between the ages of nine and eleven, Daryll was also sexually abused by a friend of his mother's.  Daryll never told his mother about the incident.  After she died, Daryll revealed what happened to him in a letter, which he enclosed in a Zip-lock bag and taped it to her head stone.

When Daryll was twelve year's old, his mother was evicted from the apartment she and her children were living in.  Having no money and nowhere to go, Deborah and the children lived for several weeks out of their car.  It was during this time that Daryll started drinking and popping Vicodin pills.  This was the beginning of more than two decades of alcohol and drug abuse.

Daryll attended Rochester City Schools through 6th grade.  In September 2001, Daryll began 7th grade at Eastridge Junior High School in Irondequoit.  In the early Spring of 7th grade, Daryll's mother moved out of the Irondequoit School District to North Clinton Avenue in the City of Rochester, causing Daryll to transfer back to the Rochester City School District.

In the short time that Daryll lived on North Clinton Avenue his brother was jumped and Daryll witnessed a homeless man die on the porch of the house his mother was renting.

Daryll desperately wanted to get away from the evils of the city. He contacted his father to ask if he could move to Irondequoit and live with him. Daryll's father agreed and in April 2002, Daryll moved to Seaview Avenue to live with his father and his father's girlfriend. *See* Exhibit B, East Irondequoit Central School District Student Registration Form, dated April 12, 2002.

When he was 14 year's old, Daryll's girlfriend, who was also only 14, became pregnant with Daryll's child. She had a full-term pregnancy, but sadly, delivered a stillborn baby boy. Daryll was distraught and attempted to kill himself by overdosing on Vicodin.

Daryll eventually dropped out of school in the middle of 10th grade. He was 17 years old at the time.

On February 1, 2011, Daryll's mother died. She was 44 year's old. Her cause of death was determined to be cirrhosis. *See* Exhibit C, Deborah M. Clark Obituary.

Daryll's childhood was filled with abandonment, drugs and alcohol, homelessness, death, and sexual, physical and emotional abuse. It is not surprising that in 2007 Daryll was diagnosed with PTSD. When Daryll was 21 he again attempted suicide a second time, this time by hanging. Fortunately, he was found by his father.

### *The BOP Cannot Provide the Mental Health Counseling and Medication that Daryll Needs*

Over the years, the BOP has struggled to provide its mentally ill inmates with appropriate care and treatment. As of midyear 2005, it was estimated that 45% of federal prisoners suffered from a mental health problem. *See* "Mental Health Problems of Prison and

Jail Inmates," *Bureau of Justice Statistics Special Report*, September 2006, at p. 1, available at http://www.bjs.gov/content/pub/pdf/mhppji.pdf.  Only 24% of these federal inmates actually received mental health treatment while in federal prison.  *Id*. at 9.  By way of contrast, mentally ill inmates serving state prison sentences had the highest rate of receiving mental health treatment while incarcerated - more than federal prisoners or even those detained in local jails; on average, 34% of mentally ill state inmates received mental health treatment.  *Id*.

More than ten years later, in 2016, the U.S. Department of Justice Office of the Inspector General reported that the Federal Bureau of Prisons "was operating at an 83 percent medical care staffing level. . . [a]s a result, health services units are left understaffed, with increased workloads that limit the amount of medical care that can be provided inside an institution."  Review of the Federal Bureau of Prisons' Medical Staffing Challenges, Office of the Inspector General, U.S. Department of Justice, March 2016, at p. 7, available at https://www.oversight.gov/sites/default/files/oig-reports/e1602.pdf.  The Inspector General also concluded that the BOP lacked a strategic plan for addressing these staffing problems:

> the BOP has not been proactive about using PHS [U.S. Public Health Service] officers to fill vacancies where individual institutions are struggling with particularly challenging medical personnel staffing needs. Institution staff further told us that lengthy vacancies are common. For example, staff at one institution told us that their Clinical Director position has gone unfilled for 15 years.

*Id*. at 21.  The report identified vacant medical positions, one for one year, one for two years, and another for five years. *Id*. at 21-22.  The report confirms that the BOP "employs relatively few psychiatrists…"  Indeed, in November of 2015, the BOP employed only 25 psychiatrists.  *Id*. at 14 and n. 39.  As of the time of the issuance of the report (March 2016),

the BOP was responsible for 192,170 federal inmates. *See*

https://www.bop.gov/about/statistics/raw_stats/BOP_pastPopulationTotals.pdf.

This number corresponds to one psychiatrist for every 7,686 inmates. The report notes that psychiatrists – as compared to general physicians - have not found the salary lucrative enough to agree to work for the BOP. *See* Review of the Federal Bureau of Prisons' Medical Staffing Challenges, Office of the Inspector General, U.S. Department of Justice, March 2016 at 13. In one instance, when the facility had difficulty filling a psychiatrist vacancy, the position was reallocated to a different institution. *Id*. at 17.

    Although Daryll was not diagnosed with PTSD until he was 19 year's old, he has most likely suffered from mental health issues for most of his life. According to the Substance Abuse and Mental Health Services Administration, children who grow up in homes where alcohol and/or drugs are abused by their parents suffer chronic emotional stress that can "damage their social and emotional development and permanently impede healthy brain development, often resulting in mental and physical health problems. *See,* https://www.crchealth.com/drug-addiction-rehab/hereditary-addiction. According to the National Institute on Drug Abuse, children of addicted parents not only suffer mental and physical health problems, but they are "eight times more likely to develop an addiction of their own." *See,*
https://www.chicagotribune.com/lifestyles/ct-life-children-addcitedparents-0430-story.html.
Furthermore, when it comes to being physically, sexually or emotionally abused, children of substance abuse addicts are three times more likely to suffer from such abuse because their addicted parents often struggle to meet even the most basic needs of their children. *See,* https://www.thearbor.com/how-addiction-affects-children.

    Daryll committed a terrible crime. For those of us not in the field of mental health care, it is difficult to understand Daryll's actions. What we do know is that he has accepted complete

responsibility for that crime and he needs and wants help.  Daryll understands he will be imprisoned for a very long time.  While serving that sentence, Daryll should not have to go without the medication and treatment that he needs.

### Daryll is at a Greater Risk of Being Physically and Sexually Abused in Prison

Due to his charges, Daryll is at a greater risk of being physically and sexually abused in federal prison.  While detained at the Livingston County Jail awaiting sentencing Daryll has already experienced such abuse.  He is regularly taunted by other inmates calling him names such as "rapo," banging on the door of his cell and threatening to kill him.  Unfortunately, even some of the jail guards treat Daryll more harshly than other inmates in subtle ways, such as giving Daryll toilet paper two days after he told guards he is out of it, or letting him watch television, but not giving him the remote.

 In prison social hierarchy, "child molesters" and "snitches" occupy the lowest rung.  Prisoner's rights activist Leslie Walker noted in an interview with ABC news that "child sex offenders are at risk of being murdered, having their food taken, even having their cells defecated and urinated in.  Their life is truly a living hell."  *See,* https://abcnews.go.com/US/prison-living-hell-pedophiles/story?id=90004.

To protect themselves from assault in prison, sex offenders can request to be put in solitary confinement.  However, solitary confinement comes with its own issues:

> Isolation can be psychologically harmful to any prisoner, with the nature and severity of the impact depending on the individual, the duration, and the particular conditions (e.g. access to natural light, books, or radio).  Psychological effects can include anxiety, depression, anger, cognitive disturbances, perceptual distortions, obsessive thoughts, paranoia, and psychosis.

*See*, Smith PS: The effects of solitary confinement on prison inmates: a brief history and review of the literature. *Crim Just* 34:441-568, 2006.

As stated previously, the defense recognizes the need to punish Daryll. At the same time, the Court must also be mindful of Daryll's mental health and safety.

### *Daryll's Physical and Mental Health*

Daryll has a family history of anxiety disorder, depression, asthma, heart disease, liver disease, alcohol abuse, drug abuse, cancer (brain tumor), and autism. *See* Exhibit D, Highland Family Medicine, Physical Exam Visit Notes, dated August 26, 2019.

Daryll's last full physical exam was on August 26, 2019. At that time, his chronic issues included depression, bipolar disorder and PTSD. Daryll also suffers from a history of seizures, asthma, obesity and mitral valve prolapse. According to the American Heart Association, mitral valve prolapse, also called MVP, is a condition in which the two valve flaps of the mitral valve don't close smoothly or evenly, but bulge (prolapse) upward into the left atrium. Mitral valve prolapse is also known as *click-murmur syndrome, Barlow's syndrome or floppy valve syndrome*. MVP is not a life threatening condition, but it is something that should be closely monitored.

### *Daryll is Extremely Sorry for His Actions*

As Daryll explains in his Letter of Acceptance to the Court, he is extremely sorry for what he has done. He acknowledges that he needs help and states that he is anxious to receive help. He wants to change. *See* Exhibit E, Letter of Acceptance written by Daryll Clark.

Daryll has been detained at the Livingston County Jail since his arrest on October 1, 2020. During the past year, he has been a model inmate. Due to his classification as a sex offender, the only program available to Daryll has been Cognitive Behavioral Intervention. Attached as Exhibit F, is a letter to the Court from Kelsey Duell, Transitional Livingston County Jail Coordinator, in which she shares how well Daryll did in the program.

Lastly, Daryll's sister Savanah Clark and his maternal grandmother have written letters on behalf of Daryll. In her letter Savanah, writes of the trauma she and her brother faced as children. With sadness, Savanah notes that Daryll's sentence could amount to a death sentence. *See* Exhibit G, Letter to the Court written by Savanah Clark. Attached as Exhibit H, is a letter written to the Court by Daryll's maternal grandmother, Carol Adams. Displaying unconditional love, as only a grandmother can, Carol asks for Daryll to come home and minimizes his actions, even though she understands that he cannot come home. To Carol and her husband, Daryll's grandfather, Daryll is the grandson who always helped them by mowing their lawn, doing handyman chores in their house, or who simply kept them company. Daryll was a "blessing" to his grandparents, Carol writes. In her simple, yet sincere way, Grandma Carol reminds us that Daryll is much more than the charges to which he has pled guilty.

Grandma Carol knows she may never see Daryll again. She closes her letter acknowledging that truth. She adds that Daryll's paternal grandparents, John and Marsha Clark, are also elderly and not well, thus they too may never see Daryll again. Carol's letter was written on September 6, 2021. John died on December 21, 2021, and Marsha died on December 29, 2021. *See* Exhibit I, Obituaries of John and Marsha Clark.

## CONCLUSION

Based on all of the above, Daryll Clark respectfully requests that this Court consider his history and characteristics, the remorse and acceptance of responsibility he has expressed, and impose a sentence at the low end of the agreed upon 11(c)(1)(C) range of 325 to 405 months.

Lastly, on behalf of Daryll Clark, it is requested that the Court recommend to the Bureau of Prisons that he be housed as close as possible to Rochester, New York, and at a facility with a S.O.M.P. (Sex Offender Management Program).

Date:   January 17, 2022

To:   John J. Field, AUSA                    /s/Jeffrey L. Ciccone, *Esq.*
      Jennifer L. Fish, USPO                 Assistant Federal Public Defender
                                             Federal Public Defender's Office
                                             28 East Main Street, Suite 400
                                             Rochester, New York 14614
                                             (585)262-6201
                                             Jeffrey_Ciccone@fd.org
                                             Attorney for Daryll Clark